St. Joseph's Hospital Health Center v. American Anesthesiology of Syracuse, P.C St. Joseph's Hospital Health Center v. American Anesthesiology of Syracuse, P.C I think we're ready to begin. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. My name is Bill Katz. I represent the appellants here, whom I will collectively refer to as NAPA. Your Honors, this appeal concerns the improper denial of a preliminary injunction request to enforce an anti-rating, non-solicitation provision in an ordinary commercial contract between two sophisticated parties. We are asking the Court to reverse and remand this case with instructions to the District Court for two reasons. First off, because the District Court did not grant the preliminary injunction that we requested and the evidence shows that we have satisfied all four elements, and so a reverse and remand with instructions to enter the injunction would be appropriate. Alternatively, we are requesting a reverse and remand with instructions to conduct an evidentiary hearing. Because the District Court did not conduct an evidentiary hearing, that is in violation of this Court's decisions in the CFTC case, Commodity Futures Trading Commission, which says that you cannot deny a preliminary injunction based upon affidavits or declarations when there are disputed fact questions. Could you identify just what the disputed fact questions are? Sure. There are several disputed fact questions. We've identified these in our briefs, but some of them had to do with goodwill and whether or not there was customer goodwill between our clinicians, our anesthesiologists and certified registered nurse anesthetists, CRNAs, and the surgeons and other physicians who are practicing at St. Joseph's. Those physicians at St. Joseph's who perform surgeries and work with our anesthesiologists, they are not St. Joseph's employees. They have privileges to practice at St. Joseph's. And so here, there was a dispute as to whether the non-solicitation clause was enforced, and if our clinicians were to move to work at other hospitals in the area, including in the Krause Hospital where the evidence showed we had a contractual relationship to work, that those surgeons would take their business and their procedures and their surgeries and move them with us to those other hospitals. So there's a disputed fact question with respect to the customer goodwill that we had with the surgeons and others who practice at St. Joseph's. Now, I thought that it was not disputed by the hospital that there were such relationships between the surgeons and the anesthesiologists, and the district court made a decision that seems to me more a question of law. It may be wrong, but that that didn't count, not that it wasn't factually true that there were such relationships between the surgeons and the anesthesiologists, but that since the surgeons didn't hire the anesthesiologists, that didn't matter. No, Your Honor, what I would say there is that that falls in the realm of the Forts case, which is not even addressed in St. Joseph's briefs. So in the Forts case, this court said that even if there are no disputed factual questions, that when there are inferences to be drawn from those facts, and you could draw competing inferences, and I think that's what the district court did here, if there are competing inferences to be drawn from those facts, then you need to have an evidentiary hearing if it's practicable. I think here it was clearly practicable, because the district court actually scheduled an initial evidentiary hearing before canceling it. If you look at the docket sheet on March the 15th, 2024, she scheduled a hearing for April the 15th. And so, Your Honor, back to your question. So if the fact is undisputed that if the non-solicitation is enforced, if our clinicians go to Crouse and start practicing at Crouse or other hospitals in the area, and if it's undisputed that the surgeons who have privileges at St. Joseph's are going to take some of their patients and their surgeries and procedures to those other facilities, the competing inferences are our inference that we argued for that the district court rejected was because there is goodwill built up that is a legitimate business interest, and that it shows irreparable injury, because it was not capable of calculation under this court's Thai Court decision as to how many patients would move, how many physicians would move, how many procedures would be performed in the future. So our inference was that the reason that the surgeons and the patients would be leaving St. Joseph's to go with us to Crouse or other facilities was because of that goodwill that we had built up, and because of the legitimate business interest in preventing raiding that this court has recognized in Omni. Can I just ask, haven't the vast majority of the clinicians that were working at St. Joseph's now accepted employment there at this point? Maybe that makes no difference, but it seems to me it affects the practical effect of the injunction to the extent you're pointing to the difficulties of quantifying injury, you may have those difficulties already. Well, it is difficult to quantify. I think, again, we talked about this because St. Joseph's brought this up. What has happened since the time of the district court's ruling we don't believe is something that can be considered for purposes of the injunction. Oh, wait, wait, wait, wait, please. Water has gone over the dam and under the bridge since all these events have taken place, right? I mean, we are now in a position where nearly half of the period during which the non-solicitation is in effect has passed, right? We're almost a year beyond when that has happened. It will be a year on July 1st, so it's a two-year non-solicit. Right, so we're heading in that direction, right? And we're still talking about a preliminary injunction that is to take effect pending resolution of the case, which may take a while. Meanwhile, meanwhile, all of these folks have taken jobs. So what is the preliminary injunction going to do in this circumstance? We're going to have to unring some bells, aren't we? The injunction would have to prevent St. Joseph's from soliciting hiring of those people. Well, that's already happened. It's supposed to prevent them then from hiring those people. That's already happened. So they have to terminate the employment of those people, and those people have to go back to work for you. Is that not what the preliminary injunction today would entail? No, because they did not hire everyone, so there's still a basis. This case is not moot. There's still a basis in which to issue it. I'm not saying it's moot. I'm talking about what makes sense for courts to do in these circumstances. What happens to the people, in your view, who are already working at St. Joseph's? Well, Your Honor, I believe that we go back to the district court, and then we have an evidentiary hearing. No, no, no. Excuse me. Please tell me what you are asking the district court to do, what you are asking us to require the district court to do. What's the relief? What's the relief with respect to those employees of St. Joseph's? The relief is reverse and remand with instructions to consider the case. What is it that you are going to get? I'm asking a very simple question.  I'm not asking. Excuse me. Please don't interrupt me. I'm not asking what are you asking us to do, and the answer is to reverse. Fine. Thank you very much. And to have a hearing. Good. Thank you very much. What is it that the preliminary injunction is supposed to accomplish at this point with respect to those anesthesiologists who have accepted employment at St. Joseph's? So those who have accepted it, I think, again, those folks were accepted improperly. You can reverse it, and you should basically tell them that they should not be able to work there. So they are going to have to be fired by St. Joseph's? You can unwind it, and the fact that there is – And are you going to hire them again? I'm sorry? Are you going to hire them again? Your Honor, I don't know. No, you don't know because they might just be unemployed because you're going to say, screw you, because we don't need you anymore. No, Your Honor. That's what I'm not going to say, but the whole purpose of all this, Your Honor, highlights the fact of why all of these issues are great questions that should all be addressed in front of the district court. Did you move for expedited hearing of this in this court? We did not, Your Honor. And you did not move to expedite the briefing by the other side? We did not. This doesn't look like you're suffering irreparable injury, does it? No, we are, Your Honor. But you don't care enough about that irreparable injury to get this show on the road sooner than it has taken so far? No, Your Honor, we are moving promptly. We did not seek expedited relief. The case is not moot. There are injunctions to be issued, and Your Honor's questions are good ones, which are ones that should be addressed by the district court in the first instance. I'm wondering whether the harms that you're seeking to enjoin or potentially unwind can, in fact, be remedied in dollars, right? No, they cannot be remedied in dollars under the Tycor case and others. You don't know in advance sitting here today or sitting at the time the district court issued its ruling as to how much business or revenue would be generated by the clinicians that were subject to the non-solicit. For example, anesthesiologists are paid based upon cases, the types of matters that they work on. So, obviously, a hip replacement is different than heart surgery, and they're also based upon the time that they work on a matter. So, in other words, you couldn't tell sitting in advance at the time the district court ruled what cases or types of procedures would the anesthesiologist work on on a going-forward basis. Is the question what you can tell at the time the district court ruled, or is the question whether at the end of the day we'll be able to look backward and come up with a reasonable estimate based on the evidence of how things actually unfolded and what the damages actually were? Well, I think under Tycor, you actually look at it at the time of the injunction request, because in Tycor, this court made it clear that when it had to deal with the title insurance executive leaving that they didn't just say, okay, we can figure out on a look-back basis how much revenue that person generated at his new job. They basically looked at it at the time and said, we don't know necessarily how much revenue is going to go. We don't know how many customers you're going to get. The provision here, you're not supposed to induce any of your docs to come. Is that the same as saying you can't hire them if they choose to come? In other words, could a doc from your shop on their own without any inducement go to St. Joseph's and say, you know what, would you hire me please to be on your staff there? Your Honor, I don't remember the exact language. Clearly inducement would be attempting to hire. I don't recall what the exact language is of the non-solicit. My recollection is, though, it applied not just to inducement but also to any efforts to try to hire. I'm just trying to figure out whether it allows passive hiring and part of why that matters. I know we're focused on irreparable harm, but it seems to me your case on the merits gets stronger the more room there is for voluntary departures of physicians to go to other places where they're not being induced, and I think it gets harder if it becomes essentially a non-compete. But it is a non-compete. I thought your answer was going to be, with all respect, Judge, that could never happen because you actually have contracts with all of those employees that impose a non-compete. Isn't that the case? We do, but I think the answer here, again, because those contracts are not in front of us and we're talking about a company. Well, you know, yeah, let's get back to that because what you are saying, you started off by saying this is just a non-solicitation clause between two companies that are all sophisticated, but the relief that you're asking for, I think you just told me, would in effect specifically enforce the non-compete that you have with your doctors, right? Because you're saying that these doctors who have already moved to St. Joseph's have to be unmoved, and then at your discretion you can either leave them in the wind or you can make them work for you because enforcing this non-solicit is entirely intertwined with enforcing the non-compete. Does that not put a different spin on whether this is just a contract between two equals or whether this is a kind of thing that we should view through the lens of an employer trying to enforce control over his employees? Now, that may be something you're also perfectly entitled to do, but isn't that really a large part of what this case is about and a large part of what you are asking to happen by this preliminary injunction, especially now that those employees have already left? Well, may I answer Judge Robinson's question and finish answering that?  So I found a provision in the contract, and it says not to take any action to induce any employee to leave in comparison to her employment. I think that would involve obviously soliciting them, but also would include making an offer to them as well. Your Honor, I don't think you look at this and consider other evidence outside the record about the non-compete system. It's not outside the record. It's all over the record. How do I know about it? I don't read the newspapers from Syracuse. I don't know anything about this. It's all I read in the record. Your Honor, when you look at what the cases have said, for example, like the DAR case and the other cases on this, what you're essentially talking about is balancing the harms here, and you're essentially talking about the public interest. Yes. Right. The DAR case says, in a case like this one between sophisticated parties where everybody goes in eyes wide open and we're going to have a joint venture together, we're going to provide staffing, and we're going to provide folks to work at St. Joseph's, and there's a mutual non-solicit that goes back and forth between the two of us. Right. You're not going to hire any of their surgery nurses. Correct. You're prevented from hiring their hospital administrators, their security guards. You're prevented from soliciting any of their employees. Who of their employees would you ever want to solicit as an anesthesiology practice? Hmm. Other than if they hired some anesthesiologists separately, which they have maintained that they really can't do because there's nobody available. Well, again, this all seems like balancing the evidence here, Your Honor, but the whole point is they've got the benefit of the bargain. Well, we are balancing the evidence, aren't we, because you are asking us to direct the district court to issue an injunction because you've satisfied all the requirements. So you are asking us, in the first instance, to decide that on this record you win, period, end of story. And I'm just probing that. Right. So, Your Honor, so the whole point is when you look at the DAR case and others in that, it recognizes that when sophisticated parties sign a contract like this, go into it eyes wide open, and then get to the end of it and have obtained the benefit of their bargain and then want to try and breach it, that that's not appropriate. That's not a hardship. When you look at the other cases— You haven't—you have not—that is not an answer to the question I asked, which is, is this not, in effect, requiring enforcement of the non-compete because that's what is going to happen. That's what you are asking for. You are asking for your employees to be returned to you or left in the wind. And at that point in time, to negotiate, as the parties agree to in their contract, a reasonable price to buy out the non-solicitation provision or— So, indeed, a price can be put and a price has been put. You've offered to take $12 million for this. That's under negotiation, I suppose. That might be fair. That might be outrageous. That might be generous on your part. But there are ways that these things can be valued. That's—I mean, this is all about money, isn't it? No, it's not about money. No, it's not about money because we have reputational harm. That's not captured by any particular buyout here. As we pointed out, we have this other contract with Krauss. We have the reputation in the community. We've had difficulty recruiting clinicians. We've had difficulty retaining clinicians. The register.com case from this court— And that's why? How does that relate to what happened here? I'm trying to understand why that's a problem. Because now we have no practice because they've raided and poached our employees in violation of Omni. And now we have no ability to recruit and retain people because they've hired most of them, although not all of them away. And there are actions pending against the anesthesiologists as well, are there not? Some of them, yes. To enforce the non-compete. Correct. And what is the status of that litigation? It is pending. It is in its early stages. And who is it before? I don't recall the judge's name, but— It's not before Judge Stanis. It's before a different judge. No, no, no. It's pending in New York State Court. State Court. Onondaga County. Yes, Your Honor. So that's in front of a state court. It hasn't been stayed or anything pending this action, has it? Not been officially stayed, no. But it's just in the usual limbo of litigation? In the usual limbo, and I think as a practical matter, that recognizing that this case may resolve some of the issues. Again, that case is pretty early on. I think we just had a confidentiality or protective order entered in that case. No discovery has been taken. Okay, fair enough. Any other questions? Thank you. We'll hear from your adversary.  Thank you, Your Honors. David Ettinger for St. Joseph's. I want to try to address four issues here quickly, Your Honors. First, why the absence of irreparable injury disposes of the appeal. Secondly, why the Omni case on which NAPA really relies does not govern here, particularly in light of the Twitchell decision, which was not in our brief, but was in their reply brief. It was a New York Appellate Division case that I think is critical here. And why, in any event, the Omni facts are dramatically different from here. Why there's no need for an evidentiary hearing. And whether one calls it mootness or not, why there's really not an issue before this court at this time. Most of that's been covered in the questioning. What I will only add to that fourth point is that I can represent that St. Joseph's is not going to be hiring any more NAPA providers. So there's no need for any injunction prohibiting it from doing so. That ship has sailed. I don't need to go any further into the parade of horribles in terms of what other relief NAPA might seek here, but I think that's a very important consideration. On irreparable injury, your honors need to distinguish between counsel's rhetoric with all due respect and what the evidence is. They have presented no evidence that these claimed injuries could not be measured in money damages, except for a conclusory statement in the affidavit of Dr. Santos, that he doesn't think it could happen. With all due respect, Dr. Santos is an anesthesiologist. He's not an accountant. He's got no finance experience. He's not a damages expert. And his opinion on that issue is of no weight. To be fair, though, isn't that opinion maybe not worth much as an expert opinion, but isn't he just restating things that courts have said about the inherent difficulties when you are dealing with questions like goodwill, for example? I don't think there are any inherent difficulties. This is about allegedly lost business. Well, let me add there. I say allegedly because there's no evidence of any injury either. There is evidence of a relationship between surgeons and anesthesiologists. Surgeon A may like anesthesiologists. B, who knows how he likes things done. Nobody has said in any declaration in this case that if the contract ends with St. Joseph's and the anesthesiologists move to Crouse, that a single surgeon will follow them. Well, the anesthesiologists don't move to Crouse, right? The anesthesiologists, if they work for NAPA, go wherever NAPA sends them. Isn't that right? Well, wherever it is, there is no evidence in the record that a single patient or a single surgeon will move with them. And that's critical because that would be what they'd have to show to show injury here. And that is what all the cases that find problems here involve. The salesman will take his customers. Excuse me. Haven't you acknowledged, and I think it's part of your antitrust claim, in effect, that they've got a stranglehold on you precisely because the surgeons like to work with particular anesthesiologists? Your Honor, there's a very important distinction there. What we say is the surgeons want to work with anesthesiologists who are experienced with them, understand what they want. And if at one moment we lost the entire cadre of anesthesiologists, had to bring in temporary people who know nothing, people might leave. What we don't say critically is that they're going to follow the NAPA anesthesiologists wherever those anesthesiologists go. So this is not a case of the employees or the providers taking customers with them or taking referrers of customers with them. Because they're not customers. That's why I was trying to get at in the questions about who actually makes these. I'm sorry, the questions about is this a fact dispute exactly or was the district court's finding about the situation between the anesthesiologists and the doctors really kind of undisputed? The question is what you're arguing now, which is the legal effect of whatever relationship there is between the doctors and the anesthesiologists. Your Honor, in a sense it's a legal question, but really it's a factual deficiency by NAPA. Because they would have to show not merely that there's a relationship, but that that relationship would result in the movement of patients ultimately. Because the referrers would move their patients to follow the anesthesia providers. That's the essence of most non-compete cases. I'm going to lose the salesman who's going to take my customers with him. And there is no evidence. NAPA could have put in an affidavit saying, gee, Dr. So-and-so loves us so much that I am convinced that if I went to Crouse, he would go to Crouse. They didn't do that. They didn't say that because it's a silly proposition, frankly. And that's the linchpin of any injury argument that they haven't made. Mr. Katz said that today. I was surprised to hear him say that, that they will follow them. But it's not in his affidavits. There's no evidence of it at all. And that's where the whole injury claim falls apart. There's no evidence of injury at all. But you do say, do you not, I thought, that the doctors would have to move to another hospital if this was enforced. In fact, that you'd kind of go out of business as a hospital and provide surgical services because you would have no anesthesiologists. So if I'm a doctor and I'm about to remove somebody's spleen or something, I have no way of going to St. Joseph's if you have no anesthesiology department, either contracted for or hired. That's a very important part of our antitrust case, correct. But that doesn't do NAPA any good in its argument. NAPA's argument has got to be not that it's going to hurt us, but that its anesthesia providers have the ability to move patients and doctors and it will hurt them to lose those guys because it will lose that ability to move patients and doctors. It's the difference between antitrust injury and goodwill. Yes, Your Honor. So on the Omni question, Your Honors, NAPA did me a favor because they cited Twitchell in the reply brief, and I looked at it. And, you know, a lot of these cases are, with all due respect, federal courts trying to figure out what a New York court would do. And it turns out that the Twitchell case, which is a 2024 appellate division case, told us what a New York court would do because it's a New York court. And it was looking at this issue of commercial contracts between sophisticated parties and how do you assess it, and it did it exactly how Judge Sanis looked at the issue. What Twitchell said was that you apply the BDO-Seidman factors in that situation. It said, quote, The simple rule of reason analysis is similar to the factors examined in the context of employment contracts. See BDO-Seidman. And NAPA's basic argument here is that Judge Sanis got it wrong because she applied the BDO-Seidman factors. And so what we now know, based on what New York courts are saying, is that that's what you've got to look to, and that's where NAPA failed. They didn't show- I mean, I'm not sure New York courts are speaking in one voice on this. I'm looking at the Genesee Valley case, which, as far as I can see, is the one that's most closely analogous because it actually deals with a covenant not to solicit employees as opposed to a non-compete. And it says very clearly that a covenant not to solicit employees is inherently more reasonable and less restrictive than a covenant not to compete if the employee has cultivated personal relationships with clients through the use of the employer's resources, which is exactly the claim here, that these anesthesiologists have developed relationships with these surgeons, and so that heightens the reasonableness of this. Why isn't that right? Your Honor, I think that fits exactly what Judge Sanis did because what they're saying is, yes, they're more equal. You look at them. You tilt the table a little bit differently in the case of a closed question, but you look at the segment factors, which include the ability to move customers, customer goodwill. That's what Your Honor just referred to. And, in fact, the point I was trying to make earlier was you may have a relationship with a surgeon, but that doesn't move the patients, and so the concern that was raised in Genesee Valley is not met here by NAPA, and that's why NAPA fails under that case as well. There's no ability to move patients. There's no confidential information that these providers can take with them to the detriment of NAPA. There's nothing in the NAPA evidence that speaks to that, and if Mr. Katz talks about the L. Akbitani Declaration, it doesn't use the word confidential once. It doesn't use the word trade secret once. It says proprietary. It doesn't discuss any of the indicia. Well, now you're sort of shifting to the factors that courts emphasize when they're looking at a non-compete provision as opposed to a non-solicitation of employees provision. I feel like there's all these different categories. There's an agreement that you're not going to solicit our customers. There's an agreement that you're not going to compete with us yourself. You are employed. And there's an agreement that you, a business entity that we're entering into an agreement with, aren't going to now come and poach our employees. Those are all significantly different in terms of the balance of interests that would affect the validity of the contract, aren't they? I think what the cases say and what Judge Santis said and did was when you look at the evidence, you may balance it a little bit differently, but you look at the same factors. In Genesee Valley, they looked at customer relationships, which Judge Santis looked at. She looked at those BDO-Seidman factors. Isn't that really the thing that's, I think, at the center of the argument here, that the goodwill is really about relationships with surgeons who, even if they're not the nominal customer, they're the ones who drive the business to anesthesiologists? Your Honor, this isn't in the record, but I use it for illustrative purposes. I talked to a surgeon and said, would you move to Krauss if the anesthesiologist you like moved to Krauss? And he burst out laughing. My point is nobody on the NAPA side in evidence, in a declaration, has said that anybody's going to move a single patient to follow the anesthesia providers. So they may have a relationship, they may like them, but that's not the issue. So you're agreeing that it is a fact question whether the customers would move to another hospital, and your position is that they have offered no evidence that that would happen? That's exactly correct, Your Honor.  It's not a – I was under the impression that what the judge really did was to say, well, there's a question about who are customers, and taking the undisputed facts, this is not a case where the anesthesiologists even have customers as such. I think the judge said it on two levels. She, first of all, said exactly what Your Honor is saying, that to say this physician is in the shoes of the customer is a step beyond what the cases have done, but even if you said that, there is no evidence in the record that says the surgeon is really going to move to follow the NAPA anesthesia providers. And so either way, NAPA loses. Whether you look at it as factual or legal, the evidence just isn't there, and it doesn't fit the cases. Which goes to why, Your Honors, I think that there's no need for an evidentiary hearing here. What Judge Sanis did was she – first of all, NAPA had three different rounds of declarations. They had multiple opportunities to submit the evidence they wanted, and what Judge Sanis said, if I take these declarations, and I simply take the facts that are in those declarations that are actually supported by competent evidence, there's not enough here for NAPA to win. And if that's the case, there's no need for an evidentiary hearing. There's no disputed facts on these essential elements of my decision. And when Mr. Katz at argument said, I want an evidentiary hearing, there are all these issues we want to present evidence on, just as NAPA said in its brief. She said, wait a second. You've had every opportunity to submit the evidence. You don't get an evidentiary hearing to fill in gaps in your declarations when I've given you all these opportunities to submit more declarations. In fact, they had an opportunity here for a complete do-over. She denied the TRO. She said the declarations are too vague, too conclusory. And then they came back and filed further briefing. They submitted one declaration later, and that was Dr. Elek Batani, and it didn't fill the gaps because he, who doesn't even work in Syracuse, made vague statements about proprietary databases, and he never said that any of those could be taken away with these providers to NAPA's detriment, which is what you'd have to show if you were going to show that confidential information might be misappropriated. There's no threat of that. There's nothing in that evidence that says that. So why do we need an evidentiary hearing when NAPA had every opportunity to be more specific and they weren't? And if your honors look at the Santos declarations, they are the vaguest thing you can ever read. Well, I am concerned that this might happen. St. Joseph's actions have made people nervous, and he doesn't even say what actions they are, and that's why she rejected those declarations as conclusory. She did that in her TRO opinion, and they had every chance to come back and be more specific and have Dr. Santos submit a third declaration, but they did not do that. They didn't do that at all. So why did they need an evidentiary hearing under those circumstances? They really did not. Is your honors signaling me that that's enough? I'll be happy to sit down. I was going to describe how even if OMB applies, the facts are very different here, but I don't know if your honors want me to take the time to do that or not. I think we have it in your papers. Thank you. Thank you. Thank you, your honors. I think this whole argument highlights the fact why the district court abused its discretion in not giving us an evidentiary hearing. Judge Lynch, your discussions with Mr. Ettinger about, well, I thought the declaration said that people would leave. Well, they wouldn't leave just to go follow our people. They were just going to leave generally. That is forced. Forced says even if there are undisputed facts, but there are competing inferences, you could draw from those facts, and there are competing inferences unquestionably, because we argue given the fact that if the non-solicits were enforced and our people left, that would cause surgeons and patients to leave and take their business and their cases and procedures elsewhere. Isn't that exactly what their antitrust case is about, is that you have the ability to close down the hospital, at least as far as surgery is concerned? But the issue today is not the antitrust injury and stuff like that. No, but it makes a difference. I mean, what you're trying to say, oh, this is just like two scientific companies that are each doing similar kinds of research agree to form a joint venture, and then they agree not to poach each other's employees who are delegated to the joint venture. And it isn't like that at all. This is a situation in which enforcing the non-solicitation effectively enforces the non-compete, and the non-compete is what the problem is. So I don't think this is a simple case. As a matter of law, like the typical non-solicitation case, this is something different than that. It is not. There is no evidence in the record about market shares or anything where you could reach that type of conclusion. The fact that, yes, there are non-competes, but the notion that somehow this would be an antitrust injury or some sort of detriment like that, that is not what the issue is here today, and there's certainly no evidence that they put in about what the market shares were or whether there's market power or antitrust injuries, Judge Robinson said. So the fact of the matter is... They have put in evidence, have they not, that anesthesiologists are in short supply. They're hard to get to come to a place like Syracuse, no offense to our sister city to the northwest, that you have most of the anesthesiologists in town. That tells you nothing about whether or not there's market power or there's any violation of Section 1 of Section 2 of the Sherman Act. It doesn't tell me that there's an antitrust violation, but it does tell me that this is something quite different than the kind of non-solicit case that I just described, which strikes me as the typical non-solicit case. Your Honor, this is a bread and butter non-solicit case. This is two sophisticated parties. This is a scenario like Omni, this is a scenario like other cases that are recognized, and followed Omni. In fact, I tried to look for cases in which two sophisticated parties entered into an ordinary commercial contract like this where they had invalidated or found the interest unprotected. Couldn't find any. And if I might finish real quickly, I can give you the list of cases. Omni, Gibbs, which is cited in Omni, DAR, National Elevator, Express Freight, and Twitchell. All of those cases involve ordinary commercial contracts. Every single one of them enforced the non-solicitation of the other restrictive covenant here. Now, those are not all injunction cases, but they all recognized it. There's no case that invalidates non-solicitations on antitrust grounds at all. Again, we've mentioned that in our briefs. There's no evidence they haven't put forward any case like that. This is a bread and butter, middle-of-the-fairway situation for a non-solicitation clause that should be enforced. I appreciate that the request for the injunction is a big ask, and that is why we have the alternative grounds, which I think is the more appropriate thing here to reverse and remand with instruction to conduct an evidentiary hearing. Let the district court sort this out if there's anything to sort out. And we could lose again, but at least we lose with a full evidentiary record and not one hand tied behind our back. Thank you very much. Thank you both. We will take the matter under advisement.